DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Dennis Bays, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating his permanent total disability ("PTD") compensation and declaring an overpayment of said compensation beginning March 2, 1998, based upon the commission's finding that the compensation was fraudulently obtained.
 {¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.) Relator has filed objections to the magistrate's decision.
 {¶ 3} Relator presents the following three specific objections: (1) there was no evidence that relator engaged in sustained remunerative employment; (2) there was no remuneration attributable to relator; and (3) the procedure employed by the commission in obtaining the signed statement from relator violated relator's due process rights and was in violation of R.C. 9.84.
 {¶ 4} With regard to relator's third objection, the magistrate found relator waived any arguments relating to his due process rights with regard to the interview procedure because he failed to raise them before the commission. We find no evidence in the record that relator raised the applicability of R.C. 9.84
before the commission or the magistrate. Although R.C. 9.84 is grounded in the constitutional right to counsel, the commission is within its authority to address the applicability of rights and duties codified in the statute. Consumers' Counsel v. Pub.Util. Comm. (1994), 70 Ohio St.3d 244, 248 (although an administrative agency may not review constitutional questions, nothing precludes the agency from passing upon the proper application or construction of a statute). Therefore, relator waived his argument with respect to R.C. 9.84. Nevertheless, based upon the information we do have in the record and uponKirch v. Ohio Bur. of Workers' Comp., 154 Ohio App.3d 651,2003-Ohio-5211, it appears the evidence is insufficient to establish the level of formality required for the application of R.C. 9.84.
 {¶ 5} Relator also argued before the magistrate that his due process rights were violated because the commission's use of a special investigations unit to investigate fraud demonstrates excessive prosecutorial bias, and the commission has a substantial pecuniary interest in the outcome. However, R.C.4121.13(F) specifically mandates that the commission must investigate all cases of fraud or other illegalities pertaining to the operation of the workers' compensation system. Given relator's lack of any authority that an agency's use of internal investigators to investigate fraud on behalf of that agency is constitutionally violative of due process, we decline to find the legislature's enactment of R.C. 4121.13(F) to be constitutionally infirm. Further, while bias could be present in these types of investigations, this is a factor to be considered on a case-by-case basis.
 {¶ 6} We also see no constitutional violation, in and of itself, in having the investigators write a statement and then having relator sign it, particularly given the finding by the commission that relator can read and has never alleged that he signed the statement under any duress or misapprehension. Statements prepared by police and signed by criminal defendants may even be admissible in criminal hearings, so far as there are no indicia of constitutional infirmity. There must be a determination in each case of the reliability of such a confession and how much weight it should be given. Therefore, this argument is without merit.
 {¶ 7} With regard to the remaining two objections, relator reargues the issues asserted before the magistrate. We have reviewed the magistrate's decision and the record, and we find no error in the magistrate's determination. Therefore, relator's first and second objections are without merit.
 {¶ 8} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of relator's objections, we overrule the objections and find that the magistrate sufficiently discussed and determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, and deny relator's request for a writ of mandamus.
Objections overruled; writ of mandamus denied.
Bryant and Sadler, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. Dennis Bays, : Relator, : v. : Industrial Commission of the State : (REGULAR CALENDAR) of Ohio, Bureau of Workers' : Compensation and Waterloo Coal Co.,: Respondents. : No. 03AP-424. :
 MAGISTRATE'S DECISION IN MANDAMUS {¶ 9} In this original action, relator, Dennis Bays, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating permanent total disability ("PTD") compensation and declaring an overpayment of said compensation beginning March 2, 1998, based upon the commission's finding that the compensation was fraudulently obtained.
Findings of Fact:
 {¶ 10} 1. Relator has two industrial claims arising out of his employment with respondent Waterloo Coal Co. The industrial injuries occurred on June 7, 1980 and December 5, 1986, and are assigned claim numbers 80-46832 and 86-50823.
 {¶ 11} 2. Relator applied for PTD compensation and was awarded said compensation effective January 15, 1991.
 {¶ 12} 3. The Logan/Portsmouth Special Investigations Unit ("SIU") of the Ohio Bureau of Workers' Compensation ("bureau") received information that relator had renewed his commercial driver's license in March 1998, during the time he was receiving PTD compensation. Thereafter, SIU surveillance of relator's residence disclosed a commercial van parked in the driveway. The van contained a marking for "Panther Transportation" ("Panther").
 {¶ 13} 4. Based upon lien information regarding the van, SIU determined that relator had applied for a loan with Ford Motor Credit Company in September 1997 to finance his purchase of the new 1997 Ford Econoline Van.
 {¶ 14} 5. SIU contacted Panther and served a subpoena for business documents relating to relator.
 {¶ 15} 6. In response to the subpoena, Panther produced voluminous documents. One of those documents is an "Application For Lease" which relator completed and signed on July 1, 1998. On the lease application, relator stated that he was both owner and driver of the vehicle to be leased to Panther.
 {¶ 16} 7. Other documents supplied to SIU by Panther indicate that on July 1, 1998, relator underwent a medical examination to qualify as a driver and that he performed a road test to qualify as a driver of a cargo van.
 {¶ 17} 8. SIU also received a multi-paged document captioned "Agreement For Leased Equipment and Independent Contractor Services" ("lease agreement") which relator executed on July 6, 1998. By this document, relator, as "owner" of the vehicle, agreed to become an "independent contractor" who leases the vehicle to Panther and who "renders certain related services to facilitate the transportation of critical shipments of goods to and from PANTHER's customers." (Emphasis sic; Stip. at 73.) The document further recites that "[n]either OWNER nor any of its employees or agents shall be considered to be employees of PANTHER." Id. (Emphasis sic.) Under the lease agreement, Panther agreed to compensate relator, as owner, 90 cents per loaded mile on the first shipment of any trip.
 {¶ 18} 9. Another document received by SIU from Panther is captioned "Owner Information Sheet." (Stip. at 68.) On this document, relator designated "Chris Bays C D B Trucking" as the owner's "company name." Relator further directed Panther to mail the checks to Chris Bays who is relator's son. Id.
 {¶ 19} 10. SIU requested further information from Panther regarding Chris Bays. Panther records indicated that Chris Bays was listed as an active driver with Panther from July 16, 1998 through June 28, 1999. Panther records indicated that Chris Bays quit as a driver on June 28, 1999.
 {¶ 20} 11. SIU also requested copies of Panther "payroll checks." Panther supplied a total of 118 checks. All but two of the checks were made payable to "Chris Bays." Eighty-nine of the checks were co-endorsed by relator on the backside.
 {¶ 21} 12. Among the documents that Panther supplied to SIU, relator had listed "Roberts Express" as a previous employer. This information prompted SIU to contact Roberts Express which is now known as "FedEx Custom Critical, Inc." ("FedExCC"). SIU subpoenaed documents from FedExCC. By letter dated April 24, 2001, FedExCC stated that relator had never been an employee of either Roberts Express or FedExCC. However, the letter further explained that FedExCC records indicate that relator was a "qualified driver" for an "independent contractor" known as Drucilla M. Bays (relator's ex-wife). (Stip. at 316.)
 {¶ 22} 13. FedExCC supplied to SIU a document captioned "Application For Lease Contract for Driver Qualification" which relator had completed and executed on March 2, 1998. (Stip. at 319-322.) On this multi-paged document, relator made application to Roberts Express for a "driver" position. In a section of the application seeking information from the applicant regarding relatives or acquaintances who have relationships with Roberts Express, relator listed Drucilla M. Bays as a Roberts Express "Contractor/Driver." He also listed Chris Bays as a Roberts Express "Driver/Rider." (Stip. at 319.)
 {¶ 23} 14. Other documents supplied to SIU by FedExCC indicate that, on March 2, 1998, relator underwent a medical examination and a driver qualification examination in connection with his application to be a driver with Roberts Express.
 {¶ 24} 15. SIU also obtained copies of seven "PTD contract letters." These are standardized form letters that the bureau periodically sends to PTD recipients. The letters ask the PTD recipient to indicate whether he or she has returned to work during the last year. Relator executed and returned each of the letters responding "no" to the query regarding work within the last year. The earliest letter is dated January 6, 1998. The latest letter is dated March 3, 2001.
 {¶ 25} 16. SIU also obtained copies of the "warrants" or checks issued by the bureau to relator for the payment of PTD compensation during the years 1999 and 2001. Each warrant contains a warning to the recipient that he or she is not entitled to the check "if you are working."
 {¶ 26} 17. On May 1, 2001, SIU special agents Jeff Daggett and Michelle Hupp interviewed relator at his residence. According to a subsequent SIU written report, relator initially indicated that he just rode with the drivers. During the interview, one of the SIU agents prepared a handwritten statement which relator signed. Relator's signed statement of May 1, 2001 is quoted in the commission's order at issue here and thus will not be repeated here.
 {¶ 27} 18. On August 10, 2001, SIU completed a written report summarizing its investigation. The report sets forth SIU's case against relator alleging that he fraudulently obtained PTD compensation.
 {¶ 28} 19. On August 10, 2001, the bureau moved the commission to terminate relator's PTD compensation, to declare an overpayment of PTD compensation beginning March 2, 1998, and to enter a finding of fraud relating to the declared overpayment.
 {¶ 29} 20. On October 3, 2001, relator executed an affidavit stating:
I, Dennis Bays, am the claimant in claim #80-46832 and #86-50823, I reside at 3822 Moriah Road, Oak Hill, Ohio 45656. I am permanently and totally disabled as a result of my industrial injuries. I am drawing approximately $320 per week as a result of my industrial injuries.
At no time did I work in any capacity for either Roberts Freight, Panther Express or for Chris or Dennis R. Bays. In December, 1997, I agreed to purchase a 1997 Ford Econoline Van from Ricart Ford for the purpose of my sons becoming involved to deliver freight for Roberts Freight. My sons Chris Bays and Dennis R. Bays II had no jobs at the time. Since I was the one with steady income, I was the appropriate person to take out the loan to purchase the van. My ex-wife, Drucilla, was driving for Roberts at the time and got the boys hired to haul freight for Roberts Freight. My son Chris Bays agreed to reimburse me the van payments every month in the amount of $567.96 as evidenced by the contract attached [t]o my statement.
My connection with the van was solely to have the van titled and also to be listed as a drive[r] for insurance purposes in order that I could operate the van for my personal use or even ride in the van when the boys were delivering freight. At no time was I paid by Roberts Freight as all sums were paid to Chris Bays or Dennis R. Bays II. I never carried the freight. I did on occasion sign papers acknowledg[ing] receipt of the freight but that was only on a long trip and when my son Chris was with me. I would drive the van home from Columbus where my ex-wife Drucilla lives and my son Dennis R. Bays II lives to Oak Hill on a number of occasions. I never was paid to drive the van. I never got paid mileage and at no time were any funds ever paid to me by any company.
I got my commercial drivers license for two reasons. One was for the purposes of insurance. I could not drive the van on the highways and I would not be covered if I was a passenger and there was an accident. I could not use the van for personal use such as going to the grocery stores unless I had a commercial drivers license. Once I got my commercial drivers license I could use the van for personal use and then also have insurance on the van.
A Class C drivers license is the lowest classification otherwise I would have to use tractor-trailer certification or air brakes for a drivers license and there was no need for me to have that type of license.
The second reason was that I could not even ride in the van unless I had a commercial drivers license and insurance. I would ride along with my sons if there was someplace that I hadn't seen. Prior to my boys being involved in this hauling of freight I had only been in three states in my life — West Virginia, Ohio and Kentucky. My sons enjoyed the company. I kept them awake when we drove. At no time did I do any of the driving on any of these trips. I did not change the tires. I did no delivery. I took no pay. When Chris would be paid he would endorse the check over to me. I would endorse the check and then cash it and give the money back to Chris who did not have a bank account. Chris had lost his credit as a result of some bad financial dealings when he was younger. Chris was also on the road. I did this as a convenience for Chris. Chris has been living with me and still lives with me throughout the period of time in question. I would then take the cash from any check that Chris received and buy the cashiers check in order to pay the Ford Motor Credit Company for their payment of $567.96 in accordance with my agreement with Chris and in order to honor my obligation with Ford Motor Credit. I never worked for Panther or Roberts. I made these arrangements solely to help my sons get established in the business and haul freight and in order to provide them with an income. The van is currently for sale. It has no license and Chris has stopped hauling freight in order to avoid further complications and problems for me. I still owe over $6,100 on the Ford van.
Attachment 3 of the Bureau's investigatory materials was completed in order that I could ride in the van. Furthermore, since I was the owner of the van I had to authorize its use to be utilized to haul freight. That is the reason why Attachments 3 with Panther Transportation were completed. Originally the van was with Roberts Express under the direction and control of Chris and my brother Robert. See Exhibit 3B. Exhibit 3C in the physical requirement has to be taken in order for the vehicle to qualify for PUCO and ODOT requirements. When I took the physical my son Chris also had to go to the orientation and also took the test and physical and driving test because he was going to be the owner-operator. He was going to be the driver of the van. While I was the owner, if I wanted to drive the van for my own personal use, I likewise had to take the various tests. Exhibits 3F in the Bureau materials indicates that the P.O. Box that was set up was to be used only for the van. We wanted to have security for any of the checks that were issued for the van and CDB Trucking reflected Chris, my ex-wife Drucilla, as being the business entity which was utilizing the van. We put the van and the company in Chris's name to reflect the reality that it was his company. My sons were ages 21 and 22 when they started. All the checks were payable to my son Chris. I was able to drive the van for personal use.
It is significant to note that the W9 reflects that all the checks were under Chris's name and all checks were issued to Chris. Chris reported on his W2's and 1099's all the income and took all the expenses.
Exhibit 3J is the lease agreement which was then signed by me because I was the owner of the van. Any of the copies of the checks that the Bureau has for Dennis that bear my name were simply done as a convenience in order to have the van payments paid by Chris. The bank required me to sign the checks when Chris was not present to sign the check. Since Chris was on the road delivering freight as far west as Colorado, as far north as Maine and as far south as Atlanta and Florida, it was a matter of convenience to allow me to cash the check.
At no time did I engage in work activity nor did I receive any of the funds from this business. The only monies which I received were those that Chris paid me for the van payment which I in turn then paid to Ford Motor Credit.
 {¶ 30} 21. On October 3, 2001, Chris Bays executed an affidavit stating:
I, Chris Bays, am the son of Dennis Bays. I was also one of the partners in CDB Trucking which was in the business of hauling freight for Roberts Freight and Panther Trans-portation.
This business arrangement was set up by my brother and me in order that we could start earning money. At that time we had no jobs and in southeastern Ohio there was not much of an opportunity to find a job. My father agreed to sign a promissory note in order to purchase a 1997 Ford Econoline Van and I signed a separate agreement on December 27, 1997, agreeing to repay the monthly payment of $567.96 per month as payment of the lease to my father. Originally, we started this company with my mother Drucilla Bays and my uncle Robert Bays. Later my other brother Dennis Bays II also joined the venture. At no time did my father participate in the operation of the van. At not time did my father earn any money from the operation of the van. At no time did my father bear any of the expenses of the operation of the van. Those were all my responsibility.
As can be seen by the attached W2's and my tax returns for 1997, 1998 and 1999, all of the income and expenses were mine. All the income was reported to m[e] under my Social Security Number. All the expenses were deducted under my Social Security Number.
I had no bank account and as a result my father would have to cash my checks for me. Since I was on the road so frequently, I would endorse the checks over to him, he would then endorse them and cash the check and then give any of the money back to me. I would then provide him with cash for the van payment and any other expenses for the van.
My father was the owner of the van and consequently had to sign any of the paperwork as owner of the van with any of the trucking companies in order to permit the van to be leased to either Panther or Roberts. He had to complete these forms in order for him to even ride in the van with us or utilize the van for his personal use. The insurance required him to have a commercial drivers license and the lease agreements required him to maintain a commercial drivers license as well. My brother and I did all the driving of the van on any of the commercial runs. My father did operate the van for his personal use going to * * * grocery stores and drug stores. He also drove it on occasion back and forth between his home and Oak Hill and my mother's house in Columbus, Ohio. At no time did he operate the van on any of the trips in which I was the driver of the van. My father would accompany me as companionship on the various trips that I took. It was also an opportunity for my father to see parts of the country which he had never seen before. At no time did he deliver any of the materials in the van itself. As a matter of fact we even built a bed in the back so my father could rest if the trip became too much for him.
 {¶ 31} 22. Following an October 16, 2001 hearing that apparently was not transcribed, a staff hearing officer ("SHO") issued the following order:
It is the finding and order of the Staff Hearing Officer that claimant's award of permanent total disability compensation be terminated. It is further found that all permanent total disability compensation paid on and after 03/02/1998 is overpaid. It is further the finding of the Staff Hearing Officer that the claimant committed fraud on and after 03/02/1998 in his receipt of permanent total disability compensation, and that the compensation paid over this period may be collected under the fraud provisions of R.C. Section 4123.511(J).
The Staff Hearing Officer relies upon the representation of the Bureau of Workers' Compensation that no DWRF monies were paid over the period in question, and consequently no order is placed ruling on the propriety of any such payments.
The Administrator has prepared and presented an extensive investigation report. The Staff Hearing Officer relies upon this report for the following conclusions, which have been summarized:
The Administrator has demonstrated that the claimant obtained loans with which to purchase two vans. The claimant also obtained the necessary licenses which would enable him to drive commercial vehicles. He entered into relationships with Roberts Express and Panthor [sic] II as an independent owner/operator of these vans. On 05/01/2001 claimant was interviewed by BWC investigator Jeff Daggett. The claimant signed a handwritten statement which was prepared during this interview. This handwritten statement states:
"I Dennis Bays was injured on 12/05/1986 while working for Waterloo Coal Company. At that time I injured my back. I have received PTD benefits from the BWC since 01/15/1991.
Since my date of injury to the present, I have worked under two independent contractors Roberts Express, Panthor [sic] Transportation.
In 1997 my ex-wife, Drucilla became an independent contractor for Roberts Express. Starting on or around 3-98 I completed paperwork for Roberts Express, took physical exams, completed written exams, etc. Around that same time I started going with Drucilla Bays making deliveries. There were times I just rode with Drucilla and there were other times I drove the truck making deliveries or driving home from making deliveries. I participated in this activity from approximately 3-98 to 7-98.
On or around 7/98 I completed paperwork with Panthor [sic] Transportation. I have taken two physical exams, took written tests, etc. This contract was under Chris Bays (CDB Trucking). Chris Bays is my son and he was also a contractor (active driver) for a short time with Panthor [sic] Transportation. In regards to Panthor [sic] Transportation (Panthor [sic]) I have driven a cargo van making deliveries since 7/98. At times Chris Bays did make deliveries while he was an active driver. Drucilla Bays never drove the Panthor [sic] van to make deliveries but rode with me several times. I have been the driver the majority of times while making deliveries for Panthor [sic]. The contract with Panthor [sic] was put in my son's name (Chris Bays). This was done in part to conceal my activity from the BWC so my disability payments wouldn't be disrupted. Panthor [sic] Transportation pays 90 cents per mile excluding $100.00 per week that Panthor [sic] takes for insurance.
I signed BWC documents that asked if I had worked since receiving PTD benefits and indicated "no" on these documents because I did not want my disability payments disrupted due to my activity with Roberts Express and Panthor [sic] Transportation.
I knew I was not supposed to work while receiving PTD benefits."
At hearing, claimant demonstrated that he is literate by reading from other documents. The claimant did not testify that he signed the statement under duress, or with any mis understanding [sic] as to its contents. Given the specificity of the statements, and the relationship to the documents which are provided in the BWC investigation report, the Staff Hearing Officer finds that the statements made by the claimant to the BWC investigator on 05/01/2001 are credible.
The Staff Hearing Officer further notes that as a part of the interview which took place on 05/01 claimant stated that at the time of a documented motor vehicle accident on 04/10/2001 he was traveling to Portsmouth to pick up a load and deliver it to Fremont when he was rear ended while stopped at a stop light.
In light of the above findings, the Staff Hearing Officer does not find it to be necessary to rule upon the Administrator's arguments that even if the claimant was not making deliveries or performing physical work, his ability to act in a management capacity for an independent contractor owner/operator and his ability to pass the physical examinations in order to obtain his commercial driver's licenses demonstrate an ability to work not withstanding [sic] not having returned to work. The Staff Hearing Officer finds that the claimant did return to work and so it is unnecessary to rule upon these arguments.
In light of the above findings, the Staff Hearing Officer also finds that each of the six elements of fraud have been met. Claimant was engaged in remunerative work activity from 03/02/1998 and yet continued to certify to the Bureau of Workers' Compensation, in their contact letters, that he was not working. This represents a representation which is false and a concealment of fact. Claimant continued to receive payments of permanent total disability compensation based upon these misrepresentations, and consequently those misrepresentations were material to the transaction. As the claimant was the one who was engaged in the work activity, those statements were made with knowledge of their falsity. As the claimant himself stated in the statement of 05/01/-2001, these statements were made with the intent to defraud because of a desire to continue to receive his permanent total disability compensation. The continued payment of permanent total disability compensation was made with justifiable reliance upon the misrepresentation, because there is a legal duty on the part of the BWC to continue to make payments in compliance with the Industrial Commission order in the absence of certification that the claimant has returned to work or otherwise become ineligible for the award. The resulting injury proximately caused by this reliance was the payment of compensation to the claimant when he was not entitled to this compensation.
In light of all the above, the Staff Hearing Officer has considered the claimant's assertion that he purchased the vans in order to assist his ex-wife, brother, and two sons in obtaining employment because he had good credit and they did not. The Staff Hearing Officer has considered the claimant's assertion that he became qualified as a driver in relationship with Panthor [sic] and Roberts so that he could travel along with his relatives without driving or doing any of the work, or use the vans personally and still be covered by the employer's insurance. The Staff Hearing Officer has also considered the claimant's allegation that the physical examinations that he took in order to qualify for his commercial drivers license were so brief as to be meaningless. The Staff Hearing Officer finds that it is unnecessary to rule upon the first of the three allegations in light of the findings made above. The Staff Hearing Officer finds the second allegation, that the claimant only rode with, and performed no work whatever in driving or otherwise, not to be credible in light of the other evidence. The Staff Hearing Officer finds the claimant's allegations concerning the physical examinations also to be unnecessary to rule upon, for the reasons discussed above.
In light of the above, the Staff Hearing Officer grants the relief requested by the Administrator at this hearing. Permanent total disability compensation is ordered terminated. It is the finding of the Staff Hearing Officer that the claimant was fraudulently overpaid permanent total disability compensation for the period commencing 03/02/1998. All payments of permanent total disability compensation for the period commencing 03/02/1998 [may be] collected under the fraud provisions of R.C. Section4123.511(J).
 {¶ 32} 23. On December 15, 2001, the commission mailed an order denying relator's request for reconsideration of the SHO's order of October 16, 2001.
 {¶ 33} 24. On April 29, 2003, relator, Dennis Bays, filed this mandamus action.
Conclusions of Law:
 {¶ 34} Two main issues are presented: (1) whether relator's May 1, 2001 signed statement is some evidence upon which the commission can rely, and (2) whether relator's sustained work activities generated remuneration in such a manner that relator can be found to have engaged in sustained remunerative employment.
 {¶ 35} The magistrate finds: (1) relator's May 1, 2001 signed statement is some evidence upon which the commission can rely, and (2) the commission's finding that relator was engaged in sustained remunerative employment is supported by the record. Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 36} Turning to the first issue, relator contends that his May 1, 2001 signed statement must be eliminated from evidentiary consideration based upon his three allegations: (1) that the bureau's responsibility to protect the state insurance fund creates "excessive prosecutorial bias" that violates due process of law, (2) that the procedure used to obtain the statement, whereby the bureau agent himself wrote the statement for relator to sign, violates due process of law, and (3) that the interview itself was fundamentally unfair because, allegedly, the injured worker who receives compensation from the bureau has "come to trust" the bureau who is now investigating the injured worker's activities.
 {¶ 37} Analysis begins with the observation that there is no evidence in the record before this court that relator presented any of his three allegations or issues enumerated above at the commission proceedings. Apparently, the October 16, 2001 hearing was not recorded and thus there is no transcript in the record of the administrative proceedings. However, relator was represented at the hearing by counsel. Apparently, counsel did not submit a memorandum to the commission to support any of the three allegations or issues presented here.
 {¶ 38} It is well-settled that issues not raised administratively are not reviewable in mandamus. State ex rel.Quarto Mining Co. v. Foreman (1997), 79 Ohio St.3d 78. It appears that relator is attempting to raise issues here in the first instance to challenge the evidentiary status of his May 1, 2001 signed statement. Relator cannot raise those issues here in the first instance and thus this court need not address relator's allegations or issues.
 {¶ 39} Nevertheless, the magistrate briefly notes that the bureau's authority to investigate fraud or "other illegalities" pertaining to the workers' compensation system is statutorily mandated under R.C. 4121.13(F), a statute that relator fails to address here. Also, relator cites no authority to support his proposition that it is improper for an investigative officer to draft a statement for the signature of someone under investigation. The magistrate notes that a similar procedure was used in another case in which the commission's finding of fraud was upheld by this court. See State ex rel. Galbraith v. Indus.Comm., Franklin App. No. 02AP-1214, 2003-Ohio-7025.
 {¶ 40} Moreover, the commission's order itself is instructive. Again, it states in pertinent part:
At hearing, claimant demonstrated that he is literate by reading from other documents. The claimant did not testify that he signed the statement under duress, or with any mis understanding [sic] as to its contents. Given the specificity of the statements, and the relationship to the documents which are provided in the BWC investigation report, the Staff Hearing Officer finds that the statements made by the claimant to the BWC investigator on 05/01/2001 are credible.
 {¶ 41} In short, the SHO could find no reason to discredit relator's May 1, 2001 signed statement. Moreover, in his October 3, 2001 affidavit that was presumably prepared with the assistance of his counsel, relator does not claim that he signed the May 1, 2001 statement under duress or that he failed to comprehend the meaning of the statement that he signed. While relator's October 3, 2001 affidavit presents a version of events that differs substantially from his May 1, 2001 statement, there is no set of facts alleged in the October 3, 2001 affidavit to suggest that the May 1, 2001 statement was not voluntarily and knowingly assented to by relator.
 {¶ 42} Accordingly, the magistrate concludes that relator's May 1, 2001 signed statement is indeed some evidence upon which the commission could and did rely to support is decision.
 {¶ 43} Turning to the second issue, the payment of PTD compensation is improper when a claimant is either performing sustained remunerative employment or is capable of doing so.State ex rel. Alesci v. Indus. Comm., 97 Ohio St.3d 210,2002-Ohio-5932. A claimant who performs sustained remunerable activity without pay demonstrates that he/she is capable of doing that same work for remuneration. State ex rel. Schultz v. Indus.Comm., 96 Ohio St.3d 27, 2002-OHIO-3316.
 {¶ 44} Here, the commission terminated PTD compensation and declared an overpayment based upon a finding that relator "was engaged in remunerative work activity." As relator correctly points out, the commission did not find that relator had engaged in sustained remunerable activity without pay that demonstrates a capacity for doing that same work for remuneration. Thus, the commission's order must stand or fall based upon a review here that determines whether there is some evidence to support a finding that relator was engaged in sustained remunerative employment and specifically that there was remuneration for the work involved.
 {¶ 45} Relator contends that there is no evidence that he was engaged in remunerative work activity. To support his contention, relator points out that, of the 118 Panther checks subpoenaed by SIU, none of those checks were issued in relator's name. In fact, all but two of the checks were made payable by Panther to Chris Bays, relator's son. The other two checks were made payable by Panther to Drucilla Bays, relator's ex-wife.
 {¶ 46} Relator's theory as to how the record fails to show the necessary remuneration is set forth in his October 3, 2001 affidavit, as follows:
* * * I took no pay. When Chris would be paid he would endorse the check over to me. I would endorse the check and then cash it and give the money back to Chris who did not have a bank account. Chris had lost his credit as a result of some bad financial dealings when he was younger. Chris was also on the road. I did this as a convenience for Chris. Chris has been living with me and still lives with me throughout the period of time in question. I would then take the cash from any check that Chris received and buy the cashiers check in order to pay the Ford Motor Credit Company for their payment of $567.96 in accordance with my agreement with Chris and in order to honor my obligation with Ford Motor Credit. * * *
 {¶ 47} Relator's theory ignores one key factor — it was relator who directed Panther to issue the payroll checks in the name of Chris Bays. As previously noted, under his lease agreement with Panther, relator held the right to direct the compensation for the work done. On the "Owner Information Sheet," it was relator who designated "Chris Bays C D D Trucking" as the owner's company name. It was also relator who directed that Panther mail the checks to Chris Bays.
 {¶ 48} In short, the evidence before the commission was that relator engaged in sustained remunerative work activity but directed that the remuneration be sent to Chris Bays. Moreover, by his own admission in his affidavit, relator exercised control over the Panther payroll checks issued to Chris Bays. According to relator, Chris Bays would endorse the checks so that relator could cash them and then relator would return the cash to Chris Bays less the payment to Ford Motor Credit Company.
 {¶ 49} Even if relator's affidavit is credited to the extent that relator avers that he gave the cash from the checks, less the payments for the van, to his son and thus he retained no portion of the money from Panther for himself, this magistrate must conclude that relator engaged in sustained remunerative employment. Clearly, relator's work activity under his lease agreement with Panther generated remuneration as evidenced by the Panther checks. Relator cannot eliminate the remuneration by directing it to someone else. It was relator's choice as to who the remuneration would be given.
 {¶ 50} Relator seemingly attempts to confuse the issue here by insisting that he should not be penalized for accepting a portion of the remuneration to make the payments to Ford Motor Credit Company for the van. Relator claims that his receipt of the money to cover the van payments is similar to a return on an investment. Clearly, the commission did not penalize relator for accepting money from Chris Bays to cover the payments for the van.
 {¶ 51} Whether or not relator actually gave the cash from the Panther payroll checks to Chris Bays is immaterial and need not be determined by the commission.
 {¶ 52} The magistrate further notes that, contrary to relator's suggestion, there is indeed some evidence relied upon by the commission to support its finding that relator engaged in sustained work activity. The commission did not believe relator's assertion that he only rode along in the van while his sons or ex-wife were driving and doing the actual delivery of the freight. The commission did find credible relator's admission in his May 1, 2001 signed statement "I have been the driver the majority of the times while making deliveries for Panther." Clearly, driving a cargo van for the purpose of transporting freight for hire is engaging in sustained remunerative employment.
 {¶ 53} The magistrate further notes that there is some evidence that relator was engaged in sustained remunerative employment as early as March 2, 1998 when he became a qualified driver for Roberts Express under his ex-wife's contract. In his May 1, 2001 signed statement, relator admits that "there were times I just rode with Drucilla and there were other times I drove the truck making deliveries."
 {¶ 54} Based upon the foregoing analysis, the magistrate concludes that the commission's finding that relator engaged in sustained remunerative employment as early as March 2, 1998 is supported by some evidence upon which it relied.
 {¶ 55} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 /s/ Kenneth W. Macke
KENNETH W. MACKE MAGISTRATE